**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

      **v.**                  **10-M-14**

**SAMVEL ISKANDARYAN,**

      **Defendant.**
_____

## DECISION AND ORDER

In accordance with Title 28, United States Code, Section 636(a)(3) and

Title 18, United States Code, Section 3401, the undersigned has the authority and

jurisdiction to conduct all proceedings in this matter, including trial.


The defendant, Samvel Iskandaryan, is charged in a one count

Misdemeanor Information with having violated Title 8, United States Code, Sections

1325(a)(1) and (2). Dkt. #5. Specifically, the defendant is charged with knowingly

entering and attempting to enter the United States at a place other than as designated

by immigration officers, *to wit*, the Lewiston Landing in Lewiston, New York and in so

doing, did knowingly elude examination and inspection by immigration officers. *Id*.

Presently pending before this Court is the defendant's motion to suppress the

defendant's statements made to local law enforcement and a United States Border

Patrol Officer at the scene. Dkt. #2 (erroneously filed in 10-CR-118). During the July

28, 2010 oral argument of defendant's motion, the Court advised counsel for the parties

that it would treat defendant's motion to suppress as a motion *in limine*. For the

following reasons, the defendant's motion to suppress is denied and the defendant's

statements to local law enforcement and Agent Henderson are admissible at trial.


**FACTS**[1]

During the afternoon on March 8, 2010, a fisherman spotted the

defendant sitting, without a life jacket, in a small inflatable raft in the Niagara River.

Dkt. #9, p.2. The fisherman contacted law enforcement. *Id*. As described in the

government's response to the instant motion to suppress, the defendant and his raft

"landed on the shoreline at the Lewiston Landing, where he was met by a Lewiston

Police Officer (Officer Michael Schuey) and a member of the Niagara County Sheriff's

Office (Trooper Edward Stefik). At that time, the defendant identified himself as Samvel

Iskandaryan and presented to Officer Schuey and Trooper Stefik his United States

Resident Alien Card and his Armenian Passport. *Id*. As described in the government's

response to the instant motion, the defendant provided various accounts of how he

came to be on the shore and where he had been. *Id*. In addition, the government

states, "[a]t the time he landed on shore, he [the defendant] had a modest amount of

currency, both Canadian and U.S., some business cards belonging to his brother, a

---

[1] The facts herein are taken from the Affidavit of United States Border Patrol
Agent Douglas A. Henderson submitted in support of a Criminal Complaint sworn to
before me on March 9, 2010 (Dkt. #1), the defendant's motion to suppress filed on June
30, 2010 and the government's response to that motion filed on July 21, 2010 (Dkt. #9).

resident in Canada, an empty backpack, a set of rental car keys and his own identification." *Id*.

On March 8, 2010, at approximately 1:00 p.m., United States Border Patrol Agent Douglas A. Henderson responded to a Lewiston Police Department request for Border Patrol assistance at the Lewiston Landing in Lewiston, New York. Dkt. #1, ¶ 3. When Agent Henderson arrived at the Lewiston Landing, he met with Lewiston Police Officer Schuey who explained that he observed the defendant traveling in a small inflatable raft across the Niagara River. *Id*. Officer Schuey further explained that he ordered the defendant to move to the Lewiston Landing to speak with him "as it appeared that his traveling via inflatable raft on the Niagara River was dangerous due to the extremely dangerous current and cold water." *Id*. Officer Schuey explained to Agent Henderson that he requested Border Patrol assistance as it appeared that the defendant was attempting entry into the United States from Canada without inspection. *Id*.

Agent Henderson explained in his affidavit that he identified himself as a Border Patrol Agent to the defendant and performed an immigration inspection. *Id*. at ¶ 4. During this immigration inspection, Agent Henderson asked the defendant about his citizenship and in response, the defendant presented Agent Henderson with his Armenian Passport and a United States Resident Alien Card. *Id*. Thereafter, Agent Henderson asked the defendant why he was traveling across the Niagara River and the

defendant advised that he had "left Canada and paddled his raft across the Niagara

River." *Id*. As set forth in Agent Henderson's Affidavit,

> [the defendant] further explained that he intended to enter
> the United States. The reason given by [the defendant] as
> to why he was trying to enter by raft, rather than present
> himself at the border was that in June or July 2009, he had
> left the United States, and entered Canada without
> inspection. He feared his exit from the United States
> jeopardized his status here, and thus, he tried to regain entry
> into the United States without inspection.

*Id*. at ¶¶ 4-5. In its response to the instant motion, the government states that "[t]he

defendant continued to provide a variety of explanations as to his presence, in a raft, at

the Lewiston landing." Dkt. #9, p.3.


Thereafter, the government explains that Agent Henderson transported

the defendant to the Border Patrol offices to confirm his status in the United States and

to run various record checks. *Id*. Moreover, the government states that as the

defendant was getting into Agent Henderson's vehicle, the defendant "blurted out that

he had put the raft in the river in Canada." *Id*. at p.14.


While at the Border Patrol offices, records were checked to determine the

defendant's status in the United States. Also while at the Border Patrol offices, the

defendant was informed of his *Miranda* warnings and the defendant signed a waiver of

his rights and provided a sworn statement. In that sworn statement, "Iskandaryan

admitted entering Canada illegally (he says in June or July 2009), then attempting to

illegally enter the United States surreptitiously, thus avoiding any record of his presence

in Canada." *Id*. at p.3.


The defendant was initially charged in a one count Criminal Complaint on

March 9, 2010 with violating Title 8, United States Code, Sections 1325(a)(1) and (2).

Dkt. #1.  On May 4, 2010, the government filed a Misdemeanor Information charging

the defendant with violating Title 8, United States Code, Sections 1325(a)(1) and (2).

Dkt. #5.  Thereafter, on June 30, 2010, the defendant filed the instant motion to

suppress the defendant's statements.


## DISCUSSION AND ANALYSIS

Relying exclusively on the United States Supreme Court's decision in

*Miranda v. Arizona*, 384 U.S. 436 (1966), the defendant argues that,

> [w]hen the border patrol officer approached defendant,
> Iskandaryan and questioned him about his actions, he
> caused defendant Iskandaryan to respond in a way as he
> would during an interrogation.  Without the proper warnings,
> the border patrol officer violated the defendant's rights and
> his responses to the officer's questions should be
> suppressed.

Dkt. #2 (Case No. 10-CR-118), ¶¶ 46-47.  An argument supported by "[a]iry

generalities, conclusory assertions" and inadmissable evidence is insufficient to create

a genuine issue of fact necessitating an evidentiary hearing. *United States v Aiello*, 814

F.2d 109, 113-14 (2d Cir.1987); *United States. v. Solano,* 300 Fed. Appx. 83 (2d Cir.

2008).  Notably, the defendant does not submit an affidavit in support of his motion to

suppress the statements he made to local law enforcement and Agent Henderson.  In

its response, the government asserts that Agent Henderson's questioning of the

defendant at the scene and prior to the defendant being read his *Miranda* warnings and

thereafter, waiving his rights, was nothing more than "on the scene fact finding

questioning" and  "routine border crossing inquiries."  Dkt. #9, p.9.  On that basis alone,

the government maintains that the defendant's motion to suppress must be denied.


        *Miranda* warnings do not have to be given to one detained at the border

for purposes of being subjected to a routine customs inquiry.  *United States v. Moody*,

649 F.2d 124, 127 (2d Cir. 1981); *United States v. Silva*, 715 F.2d 43, 46 (2d Cir. 1983).

> As the Supreme Court stated in *Carroll v. United States*, 267
> U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925), the
> rationale behind a routine customs inquiry is that "national
> self protection reasonably requir[es] one entering the country
> to identify himself as entitled to come in, and his belongings
> as effects which may be lawfully brought in."  *See also*
> *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972,
> 1978, 52 L.Ed.2d 617 (1977) (border searches are
> considered reasonable "pursuant to the long-standing right
> of the sovereign to protect itself by stopping and examining
> persons and property crossing into this country . . . .").  Such
> routine detention and questioning is an inevitable burden
> commonly associated with border crossings and falls within
> the language of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.
> 1602, 16 L.Ed.2d 694 (1966), which excludes from the
> warning requirements established therein certain "[g]eneral
> on-the-scene questioning as to facts surrounding a crime or
> other general questioning of citizens in the fact-finding
> process" because the "compelling atmosphere inherent" in
> custodial interrogation "is not necessarily present."  384 U.S.
> at 477-78, 86 S.Ct. at 1629-30; *see Chavez-Martinez v.*
> *United States*, 407 F.2d 535, 538-39 (9th Cir.), *cert. denied*,
> 396 U.S. 858, 90 S.Ct. 124, 24 L.Ed.2d 109 (1969); *cf.*
> *United States v. Henry*, 604 F.2d 908, 915 (5th Cir. 1979)

("[t]he *Miranda* requirement is not . . . applicable to every situation where law enforcement officers are asking questions.").

*Silva,* 715 F.2d at 47.

Moreover, as the United States Supreme Court has expressly stated in

*United States v. Montoya De Hernandez,* 473 U.S. 531, 537-538 (1985):

> . . . Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country. *See United States v. Ramsey*, 431 U.S. 606, 616-617, 52 L.Ed.2d 617, 97 S.Ct. 1972 (1977), citing Act of July 31, 1789, Ch. 5, 1 Stat. 29.
>
> Consistently, therefore, with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior. Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant, and first-class mail may be opened without a warrant on less than probable cause. *Ramsey, supra.* Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity, *United States v. Martinez-Fuerte*, 428 U.S. 543, 562-563, 49 L.Ed.2d 1116, 96 S.Ct. 3074 (1976), and boats on inland waters with ready access to the sea may be hailed and boarded with no suspicion whatever. *United States v. Villamonte-Marquez, supra.*
>
> These cases reflect longstanding concern for the protection of the integrity of the border. This concern is, if anything, heightened by the veritable national crises in law enforcement caused by smuggling of illicit narcotics, *see*

*United States v. Merdenhold*, 446 U.S. 544, 561, 64 L.Ed.2d
497, 100 S.Ct. 1870 (1980) (Powell, J. concurring), . . . .

There is nothing in the record before this Court that would cause this Court to conclude that the questioning of the defendant at the Lewiston Landing was anything other than a routine border inquiry. Indeed, the fact that the questioning of the defendant by Agent Henderson took place at Lewiston Landing, not a recognized port-of-entry into the United States from Canada and therefore, not a traditional inspection station, does not convert the routine border inquiry into a custodial interrogation for purposes of *Miranda*. The Court does, however, acknowledge that the circumstances of the defendant's appearance at Lewiston Landing via an inflatable raft in March 2010 and the fact that the defendant presented Agent Henderson with a United States Resident Alien Card and an Armenian Passport coupled with what the government describes as "varied answers" concerning where he entered the Niagara River, may have made it slightly more difficult to determine whether a violation had occurred. Accordingly, the questions posed by local law enforcement and Agent Henderson while at the scene and the defendant's responses thereto were part of on the scene fact finding questioning and routine border inquiry necessary to determine the defendant's admissibility into the United States and those statements should not be suppressed and therefore, are admissible at trial.

With respect to the defendant's statement as he was getting into Agent Henderson's vehicle, "that he had put the raft in the river in Canada," the only

information in the record before this Court is that the defendant "blurted out" that statement.  Dkt. #9, p.14.  Accordingly, this Court concludes that that statement was spontaneous and not in response to any law enforcement interrogation.  On that basis alone, this Court finds that the defendant's motion to suppress his statement made as he was getting into Agent Henderson's vehicle is denied and that statement is also admissible at trial.

For the foregoing reasons, the defendant's motion to suppress the defendant's statements made to local law enforcement and to Agent Henderson is denied in its entirety and the defendant's statements are admissible at trial.

DATED:    Buffalo, New York
          August 26, 2010

*s/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**
